**WO**

NOT FOR PUBLICATION

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| AMERICAN AVIATION, INC., a Utah corporation; LARRY D. WRIGHT,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>THE UNITED STATES DEPARTMENT OF TRANSPORTATION, a Department of the United States Government; THE FEDERAL AVIATION ADMINISTRATION, an agency within the Department of Transportation; KENNETH REILLY; MIRLO E. OCHOA; DENNIS PRATTE; KENT STEPHENS; JOHN ALLEN; RICHARD S. LUND; HERMAN H. ROSS; WILLIAM C. WITHYCOMBE; JOHN DUNCAN; BRADLEY D. PEARSON; JOHN DOES 1-5,<br><br>　　　　Defendants. | No. CV-09-8129-PCT-MHM<br><br>**ORDER** |

Pending before the Court is Plaintiffs' Application for a Temporary Restraining Order ("TRO"). (Dkt. # 9.) For the following reasons, the Court denies the application.

## BACKGROUND

Plaintiff American Aviation, Inc. ("American Aviation"), which is owned and operated by Plaintiff Larry D. Wright, conducts commercial air tours over national parks and tribal lands in the southwest. American Aviation began its flight operations in 1996, but the record is silent as to how many flights American Aviation conducted before 2002. In 2002,

American Aviation was awarded a contract by the City of Page to continue the air tours of another operator, Lake Powell Air, which had entered bankruptcy in 2000. A condition of the agreement between American Aviation and the City of Page was that American Aviation would continue to conduct a similar number of flights as Lake Powell Air, which conducted 15,602 flights in the year before its bankruptcy.

On January 9, 2003, American Aviation applied to the FAA for interim operating authority so that it could effect the terms of its agreement with the City of Page. On March 24, 2003, the FAA issued American Aviation interim operating authority to conduct 616 flights per year. However, American Aviation conducted approximately 4200 flights in the following year, and it apparently was not sanctioned by the FAA for exceeding its authority. No further action was taken on American Aviation's application until July 12, 2004. On that date, the FAA responded to an American Aviation inquiry by stating that its application had been misplaced. American Aviation then contacted various FAA officials, explaining that the application had been lost, again requesting operating authority, and further asking for an increase in its operational authority to 7500 flights per year.

One of the FAA officials contacted by American Aviation was Kent Stephens. Although his precise position at the FAA is not described by Plaintiffs, an exhibit refers to Mr. Stephens as working at the FAA's Office of Flight Standards Service (Dkt. # 9 Ex. B), and Plaintiffs describe him as being "intimately involved in the allocation process" (Dkt. # 9 at 6). On August 31, 2004, Mr. Stephens responded to American Aviation's inquiries with an email that stated:

> In response to your email of 8/30/04,[1] discussions are continuing with representatives from the National Park Service about your request for an increase in the number of commercial air tour operations . . . .
>
> . . .
>
> Until your request for an increase in the number of commercial air tour operations is finally determined, you may

---

[1] This email is not included in the record.

> continue to conduct commercial air tours . . . at your current level of operations. You should not consider this authorization as approval of your requested increase in operations. Rather, this authorization is an interim measure to allow you to continue your current level of commercial air tour operations at these locations, while your request for an increase is being reviewed.

(Dkt. # 9 Ex. D.)

On June 23, 2005, the FAA issued American Aviation another notice of interim operating authority, again authorizing only 616 flights per year. American Aviation contacted the FAA in an attempt to have the number increased, arguing that the Stephens email provided authority to conduct 4200 flights per year. These conversations were unavailing, but American Aviation nevertheless continued to operate roughly 4200 flights per year.

On June 1, 2007, Mr. Wright met with Gene Kirkendall, the FAA's Associate Administrator for Aviation Safety, to discuss the status of American Aviation's application. Plaintiffs assert that at this meeting "no mention was made that the August 31, 2004 authority [in the Stephens email] was not operative" (Dkt. # 9 at 8), although Plaintiffs do not describe the extent to which that email was discussed. After this meeting, no further action was taken by the FAA for several years. American Aviation continued to operate roughly 4200 flights per year, without apparent consequence. Eventually, on May 16, 2009, the FAA issued operating authority to American Aviation. That authority permitted 1062 flights per year; 462 flights over the Glen Canyon National Recreation Area and 600 flights over Navajo tribal lands.[2] The letter also noted that American Aviation could suffer an enforcement action if it exceeded these limits.

---

[2] In its opposition, the FAA introduces evidence to suggest that Mr. Wright actually signed off on this schedule of flights much earlier, in July of 2006. (*See* Dkt. # 18 Ex. C ex. A at 7.) The Court will consider Plaintiffs' statement to be the correct one for purposes of this Order because, as explained below, Plaintiffs are not entitled to a TRO even under their version of events. The Court notes, however, that this piece of evidence makes it even less likely that American Aviation currently has authority to fly the number of flights it suggests.

- 3 -

After receiving this letter, American Aviation suspended "all" of its operations. (*Id.*) It again made inquiries with the FAA, even suggesting that it would resume flights under the authority of the Stephens email. In response, on July 23, 2009, the FAA sent a letter explaining that while it is reviewing American Aviation's request for additional authority, the operating authority issued on May 16, 2009, remains in effect. On July 27, 2009, the FAA sent another letter, alleging that American Aviation is exceeding its flight allocations. American Aviation has disputed the July 23 letter with the National Transportation Safety Board ("NTSB"), but Plaintiffs allege that this dispute requires the FAA to submit its order as a complaint within ten days of American Aviation's appeal, which the FAA has not done.[3]

On July 31, 2009, Plaintiffs filed the complaint underlying this lawsuit, alleging various types of interference with contract, prospective economic advantage, and constitutional rights, and requesting declaratory and injunctive relief permitting American Aviation to continue operating "at levels consistent with the 2004 authorization" and requiring the FAA to rule on American Aviation's applications. (Dkt. # 1.) On August 19, 2009, Plaintiffs made the instant motion for a temporary restraining order,[4] asking that the Court "enjoin[] the FAA from limiting or revoking the FAA's August 31, 2004 grant of operating authority." (Dkt. # 9 at 14.) The Court held a hearing on the matter on August 25, 2009. Counsel for the FAA was given notice, filed an opposition (Dkt. # 18),[5] and appeared at the hearing.

---

[3] On August 5, 2009, American Aviation also lodged a complaint with the Department of Transportation's Inspector General, but the FAA has yet to respond to that complaint.

[4] The motion also requests a preliminary injunction. (Dkt. # 9.) This Order does not rule on that request.

[5] The opposition raises a number of substantive objections to Plaintiffs' suit (*see* Dkt. # 18), but those objections, some of which may be case-dispositive, are more properly resolved by the Judge to whom this case has been assigned. Because the undersigned Judge is merely handling the TRO request, the Court will not rule on those objections at this time.

**DISCUSSION**

I.  **Legal Standard**

"The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction." *Brown Jordan Int'l, Inc. v. Mind's Eye Interiors, Inc.*, 236 F. Supp. 2d 1152, 1154 (D. Haw. 2002). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Natural Res. Def. Council*, 129 S. Ct. 365, 374 (2008)).[6]

II.  **Analysis**

Plaintiffs request a TRO enjoining the FAA from "limiting or revoking the interim operational authority of American Aviation to conduct sightseeing flights [over certain flight routes] which [was] granted to American Aviation, Inc.[,] by the Federal Aviation Administration via Kent Stephens' email of August 31, 2004." (Dkt. # 9-3 at 1.) Upon consideration of the applicable requirements, the Court concludes that Plaintiffs are not entitled to a TRO.

  A.  **Likelihood of Success on the Merits**

---

[6]The Court notes that, before the *Winter* decision, the Ninth Circuit also described an alternate phrasing of the test, under which the applicant would have to show "either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips in its favor." *Roe v. Anderson*, 134 F.3d 1400, 1402 (9th Cir. 1998) (quoting *United States v. Nutri-cology, Inc.*, 982 F.2d 394, 397 (9th Cir. 1992)). Although *American Trucking*, 559 F.3d at 1052, overruled all previous cases employing a "lesser standard" than *Winter*, it is unclear whether this formulation of the TRO standard remains viable, especially as it permits the granting of preliminary injunctive relief based on the mere "possibility" of irreparable injury, which Winter forbade. *See* 129 S. Ct. at 375 ("We agree . . . that the Ninth Circuit's 'possibility' standard is too lenient. Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction."). Regardless, for the reasons described below, Plaintiffs are not entitled to a TRO under either standard.

Plaintiffs have presented insufficient evidence of probable success on the merits to be granted a TRO. The scope of the requested TRO requires Plaintiffs to establish that the email sent by Mr. Stephens on August 31, 2004, granted American Aviation interim operating authority to conduct more than 616 flights. This would require some evidence that Mr. Stephens' statement that American Aviation "may continue to conduct commercial air tours . . . at your current level of operations" was meant to refer to the 4200 flights American Aviation was actually conducting, and not to the 616 flights it was authorized to conduct. Plaintiffs have presented no such evidence. The email to which Mr. Stephens' email responded is not included in the record, and thus there is no way to know what he meant by that statement. Plaintiffs therefore have not provided evidence to establish that Mr. Stephens meant to authorize nearly seven times as many flights as the existing order authorized. Indeed, Plaintiffs have not even introduced evidence to establish that Mr. Stevens had the authority to do so.

Moreover, Plaintiffs have not provided the Court with any legal authority suggesting that the Stephens email could remain operative after the FAA's explicit ruling on May 16, 2009, that Plaintiffs' request for operating authority was limited to 1062 flights per year. As Plaintiffs concede, the Air Tour Management Act of 2000, 49 U.S.C. § 40128, empowers the FAA and the National Park Service to regulate the number of air tour operators flying over national parks and tribal lands. While Plaintiffs assert that the May 16 letter did not mention the Stephens email, Plaintiffs offer the Court nothing from which to conclude that this fact renders the decision in the May 16 letter invalid. Based on the factual record and legal argumentation presented to the Court, Plaintiffs cannot establish that the Stephens email entitles them to continue to operate at 4200 flights per year.

/ / /

/ / /

/ / /

## B. Likelihood of Irreparable Injury

Plaintiffs have also not established a likelihood of irreparable injury if the Court declines to issue a TRO. Plaintiffs assert that they are running low on funds, having suspended their operations in May, and thus face "commercial extinction" if this TRO is not granted. However, Plaintiffs have not established that American Aviation will go out of business if the Court declines to enter a TRO. Plaintiffs remain authorized to conduct 1062 flights per year. Plaintiffs may have to downsize their air fleet or make other cuts, but they have not demonstrated that they face "commercial extinction," which is the injury they assert in the pending application.

## C. The Balance of the Equities

The Court acknowledges that Plaintiffs are suffering harm in that they currently have the capacity to conduct more flights than they are authorized to fly. The Court assumes from the fact that Plaintiffs have suspended "all" of their operations that American Aviation has already reached or exceeded the number of flights it is entitled to conduct this year, and thus all of Plaintiffs' remaining expenses for this year will not be offset by revenue.

This is, however, a harm that is at least partly of Plaintiffs' own making. Plaintiffs began exceeding the allotted 616 flights per year *before* the Stephens email, and they have continued to do so for years. Indeed, Plaintiffs have exceeded the number of flights explicitly authorized for nearly five years based on a single, ambiguous sentence in an email from an employee who may not even have the authority to authorize an increase in flights. The Court appreciates that the application process has been frustrating to Plaintiffs and that the FAA may not have managed that process well – but Plaintiffs simply cannot credibly claim to have been innocent bystanders in the creation of the dilemma in which they now find themselves. Thus, Plaintiffs are not in a good position to claim the protection of the Court's equitable powers.

But even accepting the harm that Plaintiffs will suffer, the Court would not find that the equities tip sharply in Plaintiffs' favor. Balanced against the harm Plaintiffs suffer from being unable to operate more than 1062 flights per year is the harm of quadrupling the air

traffic the FAA has expected and authorized from American Aviation. Although Plaintiffs avow that American Aviation is a safe air tour company, the Court would not authorize it to fly four times as often as the FAA feels appropriate based solely on such a fact. In the absence of a thorough record to establish that granting Plaintiffs' request would be safe for the passengers, crew, and other air traffic involved, the Court would not override the FAA's determination that 1062 flights per year is the appropriate amount for American Aviation to fly.

Moreover, beyond safety concerns, the FAA and the National Park Service take a number of other factors into consideration in determining how many times a tour operator may fly over national parks and tribal land, including environmental concerns, noise and other aesthetic disturbances, and the input of tribal governments. *See* 49 U.S.C. § 40128. These are all factors that the FAA, and not the Court, is equipped to evaluate. Without anything in the record to establish that these concerns are not offended by increasing the number of flights American Aviation is authorized to conduct, the balance of the equities tips against the granting of a TRO in this case.

### D. The Public Interest

For many of the same reasons discussed above, the Court is not convinced that an injunction is in the public interest. The Court's principal concern in this regard is with aviation safety, and secondarily with the other considerations incident to determining how often an air tour carrier can fly over national parks and tribal lands. The FAA has made its determination in this case, and Plaintiffs have presented nothing to establish that increasing American Aviation's annual flight allotments from 1062 to 4200 takes these concerns into account, much less has it established that 4200 flights would serve these interests better. Plaintiffs therefore have not established that granting a TRO is in the public interest.

///

///

# CONCLUSION

Plaintiffs have not established that any of the considerations relevant to the granting of a TRO weigh in their favor.

**IT IS THEREFORE ORDERED** that Plaintiffs' Application for a Temporary Restraining Order (Dkt. # 9) is **DENIED**.

DATED this 25th day of August, 2009.

_____
G. Murray Snow
United States District Judge